IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**RICKEY THOMPSON; RENCIE FELLS**                                              **PLAINTIFFS**

**V.**                                              **CAUSE NO. 3:15-CV-620-JEG-DPJ-CWR-FKB**

**ATTORNEY GENERAL OF THE STATE**                                              **DEFENDANTS**
**OF MISSISSIPPI; LEE COUNTY**
**DEMOCRATIC PARTY EXECUTIVE**
**COMMITTEE; LEE COUNTY**
**ELECTION COMMISSION**

## MEMORANDUM OPINION AND ORDER

Before GRAVES, Circuit Judge, and JORDAN and REEVES, District Judges.

PER CURIAM:

Before the Court is the plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. Docket No. 3. After considering the briefing and argument of counsel, we conclude that the motion must be denied as to the claim under § 5 of the Voting Rights Act of 1965.

**I.      Factual and Procedural History**

Rickey Thompson became a Justice Court Judge in Lee County, Mississippi, in January 2004. He was the first elected African-American Justice Court Judge in Lee County.

In May 2015, the Mississippi Supreme Court determined that Thompson had repeatedly engaged in misconduct and ordered him removed from office. *Miss. Comm'n on Judicial Performance v. Thompson*, No. 2014-JP-1309-SCT, 2015 WL 3545025 (Miss. May 21, 2015) ("*Thompson III*"); *see also Miss. Comm'n on Judicial Performance v. Thompson*, 972 So. 2d 582 (Miss. 2008) ("*Thompson I*"); *Miss. Comm'n on Judicial Performance v. Thompson*, 80 So. 3d

86 (Miss. 2012) ("*Thompson II*"). Under a Mississippi statute, Thompson's removal made him ineligible to ever again be a Judge in Mississippi. Miss. Code Ann. § 9-19-17.[1]

The Mississippi Supreme Court's ruling went into effect on August 13, 2015. By then, however, Thompson had already won his reelection campaign in the Lee County Democratic Party primary.[2] On August 4, 2015, he received 55% of the vote in a race against four other candidates. Because the district is a majority African-American district, and in Mississippi the vast majority of African-Americans vote for Democratic candidates, the parties in this lawsuit have assumed that Thompson will win the general election in November if his name appears on the ballot.[3]

Thompson's primary victory presented the Lee County Democratic Party and the Lee County Election Commission with a dilemma. If the Mississippi Supreme Court's decision had in fact rendered Thompson ineligible to again serve as Judge, per § 9-19-17, then the Democratic Party could not certify Thompson as its nominee as a matter of law, and the Election Commission would not be able to place his name on the ballot.

The Lee County Democratic Party sought advice from the Mississippi Attorney General's Office. That office recommended that the Party follow § 9-19-17 and select a different candidate to stand for the general election.

Thompson and co-plaintiff Rencie Fells, a voter in Thompson's district, filed this suit on August 21, 2015. They claim that § 9-19-17 violates the Voting Rights Act of 1965, the Fourteenth Amendment to the United States Constitution, and Section 171 of the Mississippi

---

[1] Section 9-19-17 reads, in its entirety, "A justice or judge removed by the supreme court or the seven-member tribunal is ineligible for judicial office, and pending further order of the court, may be suspended from practicing law in this state." Miss. Code Ann. § 9-19-17.
[2] The parties stipulated that Thompson is an African-American voter who qualified as a Democratic candidate for Justice Court Judge, ran for the office, and won the primary election.
[3] Two candidates have qualified as independents, but at oral argument counsel for the Attorney General advised that one of the independent candidates has withdrawn from the race.

Constitution. They seek to enjoin enforcement of § 9-19-17, which if enjoined would allow the Lee County entities to place Thompson's name on the general election ballot.[4]

The Lee County Democratic Party was supposed to select its nominee on September 1, 2015. It agreed to delay its decision so that this Court could take up the motion at an evidentiary hearing on September 4. The hearing was held, and the Court now rules as follows.

## II.     Legal Standard

To receive a preliminary injunction, the movant must show "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012) (citation omitted). "Each of these factors presents a mixed question of fact and law." *Id.* (citation omitted).

"A preliminary injunction is an extraordinary remedy. It should only be granted if the movant has clearly carried the burden of persuasion on all four . . . prerequisites." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## III.    Discussion

### A.     Substantial Likelihood of Success on the Merits

"To assess the likelihood of success on the merits, we look to standards provided by the substantive law." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quotation marks and citation omitted).

---

[4] Thompson has brought a separate claim under 42 U.S.C. § 1981, which is not the subject of the plaintiffs' current motion.

1. **Section 5 of the Voting Rights Act**

The plaintiffs first contend that § 9-19-17 is invalid because it was never precleared under § 5 of the Voting Rights Act. Indeed there is no dispute that Mississippi neither sought nor received preclearance of § 9-19-17 before it was enacted in 1980.

a. **Substantive Law**

"The Voting Rights Act implemented Congress' firm intention to rid the country of racial discrimination in voting." *Hathorn v. Lovorn*, 457 U.S. 255, 268 (1982) (quotation marks and citation omitted). It was "a response to the unremitting and ingenious defiance of the command of the Fifteenth Amendment for nearly a century by State officials in certain parts of the Nation." *McCain v. Lybrand*, 465 U.S. 236, 243 (1984) (quotation marks and citation omitted).

Section 5 of the Act – the preclearance requirement – prohibited "covered" jurisdictions from changing their voting laws, practices, or procedures unless the jurisdiction submitted the proposed change to the United States Department of Justice and received the Department's approval or non-objection. *Id.* at 244-45; *Clark v. Roemer*, 500 U.S. 646, 649 (1991). Alternatively, a jurisdiction could seek preclearance from the United States District Court for the District of Columbia. 52 U.S.C. § 10304(a).

Section 5 requires preclearance whenever a covered jurisdiction "shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect" when the Act was applied to that jurisdiction. *Id.* It was "a process aimed at preserving the status quo until the Attorney General or the courts have an opportunity to evaluate a proposed change." *Young v. Fordice*, 520 U.S. 273, 285 (1997) (citation omitted).

Mississippi was a covered jurisdiction from 1965 to 2013. *E.g.*, *id.* at 275 ("The question before us is whether § 5 of the Voting Rights Act . . . requires preclearance of certain changes that Mississippi made in its voter registration procedures . . . ."); *Allen v. State Bd. of Elections*, 393 U.S. 544, 548 n.3 (1969) ("Both States involved in these cases [Mississippi and Virginia] have been determined to be covered by the Act."); *Connor v. Waller*, 421 U.S. 656, 656 (1975) (applying § 5 of the Voting Rights Act to new Mississippi statutes); *Hathorn*, 457 U.S. at 265 ("Respondents do not dispute that the change in election procedures ordered by the Mississippi courts is subject to preclearance under § 5.").

The preclearance requirement was very strict. "[M]inor, as well as major, changes require[d] preclearance." *Young*, 520 U.S. at 284 (citation omitted). The jurisdiction had the burden to prove that the proposed change was "not motivated by a discriminatory purpose and will not have an adverse impact on minority voters." *McCain*, 465 U.S. at 247 (citations omitted). It did not "matter for the preclearance requirement whether the change works in favor of, works against, or is neutral in its impact upon the ability of minorities to vote." *Young*, 520 U.S. at 284 (citation omitted). The preclearance submission also had to be specific. There was a "presumption that any ambiguity in the scope of the preclearance request must be construed against the submitting jurisdiction." *Clark*, 500 U.S. at 659.

The punishment for not preclearing the proposed change was severe: the new law was simply "not effective" until it was "cleared pursuant to § 5." *McCain*, 465 U.S. at 245 (quotation marks, citation, and brackets omitted). "If voting changes subject to § 5 have not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting the State from implementing the changes." *Clark*, 500 U.S. at 652-53 (collecting cases); *see also Young*, 520 U.S. at 291 (remanding "with instructions for the District Court to enter an order enjoining further use of

5

Mississippi's unprecleared changes as appropriate"). Perhaps because the stakes were so high, Mississippi had on occasion resubmitted its proposed voting changes to the Department of Justice when the State was "confused" about whether certain changes were properly precleared. *E.g.*, *Dupree v. Moore*, 831 F. Supp. 1310, 1315 (S.D. Miss. 1993) *vacated on other grounds in Lamar Cnty. Bd. of Educ. & Trustees v. Dupree*, 514 U.S. 1059 (1995).

In 2013, the Supreme Court invalidated the formula Congress had used to determine which jurisdictions were covered by § 5. *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013). The data Congress had used to reauthorize the Act in 2006 showed "great strides" in "redressing racial discrimination and integrating the voting process." *Id.* at 2626. Given the progress, Congress's decision to use an *older* coverage formula, one "based on decades-old data and eradicated practices," was irrelevant and irrational. *Id.* at 2627-28. The Court held that "continued reliance" on the old coverage formula was unconstitutional because Congress failed to update the formula to accurately identify those jurisdictions in need of oversight. *Id.* at 2629.

*Shelby County* did not strike down the entire Voting Rights Act. Other parts of the Act, including §§ 2 and 5, remained in effect. *Id.* at 2631 ("Our decision in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2. We issue no holding on § 5 itself, only on the coverage formula."). The case simply held that the old formula "can no longer be used as a basis for subjecting jurisdictions to preclearance." *Id.*

But without a coverage formula, no jurisdictions are presently covered by § 5's preclearance requirement. *Id.* at 2632 n.1 ("without that formula, § 5 is immobilized") (Ginsburg, J., dissenting). Thus, formerly covered states may now immediately "enact or seek to administer"[5] voting laws, practices, and procedures without having to await review by the Department of Justice. *E.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224,

---

[5] 52 U.S.C. § 10304(a).

6

229 (4th Cir. 2014) (finding that "North Carolina began pursuing sweeping voting reform" on June 26, 2013, the day after *Shelby County* was handed down); *Davis v. Abbott*, 781 F.3d 207, 212 (5th Cir. 2015) ("The day after *Shelby County* came down, on June 26, 2013, then-Governor Rick Perry signed the bill repealing the 2011 plan, adopting the new Senate plan . . . , and making the plan immediately effective.").[6]

### b.   Analysis

The present case presents a current attempt to prohibit the administration of a law which was enacted prior to the *Shelby County* decision and was never precleared. We assume without deciding that § 9-19-17 was a qualification for elected office covered by § 5. And it is undisputed that § 5's approval requirements were never met; the parties stipulated that § 9-19-17 was never submitted for preclearance.

If presented with these same facts before *Shelby County*, we likely would have enjoined the State from administering § 9-19-17 until the law was precleared with the federal authorities. But *Shelby County* declared the coverage formula unconstitutional. 133 S. Ct. at 2631. The "great strides" made towards redressing voter discrimination since enactment of the Voting Rights Act were sufficient to find the coverage formula unconstitutional. *Id.* at 2626. The result of *Shelby County* is that § 5 cannot be enforced at all, and especially not by an injunction. In essence, Mississippi and the other covered jurisdictions were granted a reprieve. They no longer have to seek preclearance for voting changes, and the record evidence indicates that the Department of Justice will no longer provide it. *See* Def.'s Resp. [8], Ex. "E."

The plaintiffs argue that *Shelby County* actually means that § 5 now extends nationwide. They reason that 'if no one is covered, everyone is covered.' We think this result inconsistent

---

[6] *But see Texas v. United States*, No. 14-5151, 2015 WL 4910078, at *8 (D.C. Cir. Aug. 18, 2015) (observing that, technically, "[t]he judgment in *Shelby County* did not issue until July 29, 2013 . . . .").

with *Shelby County*. It is unlikely the Court would attempt to legislate a nationwide expansion of preclearance, which was repeatedly described as an "extraordinary" remedy justified by "exceptional conditions," when the findings in Congress's 2006 reauthorization were deemed too weak to support preclearance in just a handful of states and counties. *South Carolina v. Katzenbach*, 383 U.S. 301, 334 (1966); *McCain*, 465 U.S. at 244; *Morris v. Gressette*, 432 U.S. 491, 504 (1977); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 211 (2009); *Shelby Cnty.*, 133 S. Ct. at 2629. The plaintiffs have not pointed to any statement from the Department of Justice, or any judicial opinion, holding that *Shelby County* expanded the Voting Rights Act.

The question remains whether *Shelby County* applies to Mississippi's current effort to administer § 9-19-17, a law passed when preclearance was required but that was never precleared. In her dissent, Justice Ginsburg observed that "without [the coverage] formula, § 5 is immobilized." *Shelby Cnty.*, 133 S. Ct. at 2632 n.1 (Ginsburg, J., dissenting). Later, she even more clearly stated: "The Court stops *any application of § 5* by holding that § 4(b)'s coverage formula is unconstitutional." *Id.* at 2648 (emphasis added). While recognizing that a dissent is not necessarily a reliable guide to a majority opinion, we think Justice Ginsburg was correct and follow her approach. "Any" means "any."

Though the authority on this point is limited, every court to consider the application of *Shelby County* in a § 5 contest has concluded that it applies to laws passed before *Shelby County* was decided. *See King v. Lumpkin*, 545 F. App'x 799 (11th Cir. 2013); *Bird v. Sumter Cnty. Bd. of Educ.*, No. 1:12-CV-76, 2013 WL 5797653, at *2 (M.D. Ga. Oct. 28, 2013). And two courts have more particularly held that *Shelby County* applies to laws passed before 2006 – *i.e.*, to laws, like § 9-19-17, enacted during a time when the coverage formula's constitutionality was not

8

disputed. *See Hall v. Louisiana*, 973 F. Supp. 2d 675 (M.D. La. 2013); *Ford v. Strange*, No. 2:13-CV-214, Docket No. 35 (M.D. Ala. Sept. 10, 2013).

"[T]he court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). Here, because § 5 cannot be enforced after *Shelby County*, and this Court cannot enjoin the state authorities from seeking to administer the provisions set forth in § 9-19-17, the plaintiffs have not persuaded us that they have a substantial likelihood of success on the merits of this claim. And, since substantial likelihood of success is the most important element of the preliminary injunction standard, we need not consider the final three factors of the standard.[7]

### 2. The Plaintiffs' Remaining Federal Claims

This three-judge panel was convened to consider the plaintiffs' § 5 claim. *See League of United Latin Am. Citizens (LULAC) of Texas v. State of Tex.*, 113 F.3d 53 (5th Cir. 1997); 52 U.S.C. § 10304(a). While we have the authority to rule on the remaining federal causes of action, *see Smith v. Clark*, 189 F. Supp. 2d 529, 540 (S.D. Miss. 2002), we decline to do so. *E.g.*, *Clark*, 500 U.S. at 649. The District Judge originally assigned to this case will resolve these claims.

## IV. Conclusion

The plaintiffs' motion is denied with respect to the claim under § 5 of the Voting Rights Act.

**SO ORDERED**, this the 9th day of September, 2015.

---

[7] The Court emphasizes that the current status of § 5 does not leave an aggrieved party without recourse in an appropriate case if the State's actions otherwise violate § 2.

JAMES E. GRAVES, JR., concurring:

While I agree that the preliminary injunction should not issue, I acknowledge that this case presents a difficult question that requires a holding against the Plaintiffs. That holding is compelled, at least in part, by the ambiguity of our authority to remedy violations of § 5 in light of the invalidation of § 4(b)'s coverage formula.

The Supreme Court in *Shelby County* "issue[d] no holding on § 5 itself," instead deciding that Congress's 2006 extension of § 4(b)'s coverage formula triggering preclearance under § 5 was unconstitutional under "current conditions." 133 S. Ct. at 2631. The Supreme Court also refused to overturn prior opinions holding that the 1970, 1975, and 1982 amendments extending the coverage formula were constitutional. *Id.* at 2620-2621. Plaintiffs properly argue that, based on those holdings, *Shelby County* does not void § 4(b)'s coverage formula from enactment through 2006. In fact, there is no dispute in this case that at some point following enactment, § 9-19-17 should have been submitted for preclearance[1] and that Mississippi failed to do so. In seeking relief for this failure, Plaintiffs request that we enjoin enforcement of § 9-19-17. The state argues, citing a letter it received from the United States Department of Justice (DOJ), that an injunction may not issue because the DOJ will no longer review applications for preclearance. The authority to issue such an injunction is unclear post-*Shelby County*.

"The goal of [the] three-judge district court" in hearing § 5 claims is to fashion a remedy appropriate to "ensure that the covered jurisdiction submits its election plan . . . for preclearance." *Lopez v. Monterey County*, 519 U.S. 7, 24 (1996). But, submission alone does not render a statute lawful and enforceable. Instead, I see the preclearance requirement as two-fold, requiring both a submission and a determination[2] that the change does not unlawfully alter voting conditions or eligibility. It remains unclear if we may issue any remedy to achieve such a goal.

---

[1] When the statute became effective in 1980, there was some uncertainty regarding whether judges were representatives covered by the Voting Rights Act. But, whether or not the statute should have be submitted for preclearance before it became effective, Mississippi was certainly on notice after enactment that any laws affecting judicial elections were covered by § 5. *See Clark v. Roemer*, 500 U.S. 646 (1991); *Kirksey v. Allain*, 635 F. Supp. 347 (S.D. Miss. 1986); *Haith v. Martin*, 618 F. Supp. 410, 413 (E.D.N.C. 1985), *affirmed* 477 U.S. 901 (1986).

[2] Prior to *Shelby County*, preclearance could be achieved through actual approval of the submission by the DOJ, failure of the DOJ to reply to the submission within sixty days, or by filing of an action for declaratory judgment in the United States District Court for the District of Columbia.

Conceivably, the relief requested by Plaintiffs could result in preclearance.  For example, *Shelby County* did not strip the United States District Court for the District of Columbia of jurisdiction to hear an action seeking a declaratory judgment that § 9-19-17 complies with the Voting Rights Act.  Mississippi could file such an action and an affirmative decision would dissolve any injunction.  The Mississippi legislature could also reenact § 9-19-17.  Since Mississippi is not subject to preclearance for changes made after 2006, any newly enacted changes are automatically enforceable.  It seems obvious that if we did enjoin Mississippi from applying § 9-19-17, there are steps the state could take to cure the deficiency and achieve the goal of preclearance.  But, the Supreme Court's decision in *Shelby County* to eliminate the coverage provisions yet "issue no holding on § 5 itself" clouds our authority to do so.

Section 5 of the Voting Rights Act is the law of the land.  Invalidating the Act's coverage formula leaves open the question of whether there is an appropriate remedy, such as an injunction, that could achieve § 5's purpose.  The Supreme Court certainly could not have intended to effectively grant immunity for all violations of § 5 that occurred before 2006.  But much less certain is what a three-judge panel should do when confronted with a violation of § 5 that occurred before 2006.

For these reasons, I concur that a preliminary injunction should not issue.

CARLTON W. REEVES, concurring in the judgment:

I agree that no preliminary injunction should issue. The plaintiffs have not established a *substantial* likelihood of success on the merits. The State's enforcement of § 9-19-17 may in fact comply with federal law.

I write separately, though, to note uncertainty in the reach of *Shelby County*. The panel concludes that after *Shelby County*, courts cannot enforce § 5 at all. But another possible interpretation of *Shelby County* is that courts cannot enforce § 5 for voting changes enacted after July 27, 2006, the date the Voting Rights Act was reauthorized with an unconstitutional coverage formula. If that is the case, § 5 still applies to voting changes enacted before 2006, including § 9-19-17.

A few considerations have shaped this view.

First, the text of *Shelby County* suggests that it applies prospectively. The Supreme Court framed the question not as whether the Act's "extraordinary measures" were previously constitutional – they were – but instead whether they "*continue* to satisfy constitutional requirements." *Shelby Cnty.*, 133 S. Ct. at 2619 (emphasis added). The coverage formula was invalidated "in light of current conditions," not conditions as they were in 1965 or 1980. *Id.* at 2627. And the ultimate holding was that the coverage formula "*can no longer* be used as a basis for subjecting jurisdictions to preclearance." *Id.* at 2631 (emphasis added).

This language is forward-looking. The opinion acknowledged the many benefits the Voting Rights Act provided to our society because it did not wish to disturb them.[1] It simply held that preclearance was no longer necessary for *future* changes. Other courts agree. *See, e.g., Page v. Virginia State Bd. of Elections*, No. 3:13-CV-678, 2015 WL 3604029, at *4 (E.D. Va. June 5,

---

[1] I think all agree that *Shelby County* also did not disturb § 5. Section 5 is immobilized only by way of its intersection with the coverage formula. *See Shelby Cnty.*, 133 S. Ct. at 2631 ("We issue no holding on §5 itself, only on the coverage formula. Congress may draft another formula based on current conditions.").

2015) (three-judge court) (holding, in case filed after *Shelby County*, that "Section 5's requirements of review and preclearance for covered areas no longer apply to Virginia with respect to future changes to its voting and election laws."); *Harris v. Arizona Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1076 (D. Ariz. 2014) ("Nothing in *Shelby County* suggests that all those maps [drawn after the 2010 census] are now invalid, and we are aware of no court that has reached such a conclusion, despite the concern expressed in the dissenting opinion that leaving the maps in place would give continuing force to Section 5.").

The Mississippi Attorney General's Office may also agree. When the Office was consulted in 2013 on the reach of *Shelby County*, it issued a formal opinion stating the following:

> A retroactive application of *Shelby County* to give immediate effect to legislation objected to prior to *Shelby County* and commonly considered to be dead by all parties concerned would lead to needless confusion in the conduct of elections in Mississippi.
>
> A prospective application, which is indicated by the Supreme Court by its own plain language quoted above, leaves existing election law in place and offers the Mississippi legislature the freedom to consider amendments in the future which comply with the remaining effective provisions of the Voting Rights Act without Mississippi being subject to any preclearance requirements.

In re: The Honorable Eddie Hadskey, 2013 WL 5975618, at *3 (Miss. A.G. Oct. 28, 2013).[2]

Under the reasoning of this opinion, § 9-19-17 cannot be enforced. The statute was technically and legally 'dead' from 1980-onward because it was never precleared.[3] *See* 28 C.F.R. § 51.1(a).

---

[2] The Hadskey opinion was not anomalous. *See* In re: Kimberly P. Turner, Esquire, 2013 WL 5975639, at *1 (Miss. A.G. Oct. 30, 2013) ("Question One: In light of . . . *Shelby County* . . . , are the majority vote requirements provided for in HB 877 (Chapter 470, Laws of 2009) now enforceable? Response: No.").

[3] I acknowledge it can be difficult to determine when a new decision is retroactive. Most of the cases finding *Shelby County* retroactive are not helpful on this point: since they were pending when the decision was handed down, *Shelby County* applied immediately as a matter of course.

  To be fair, *Hall v. Louisiana* does discuss the application of *Shelby County* to pre-2006 voting changes. I am just not sure *Hall* is correct. To me, the holding of *Shelby County* that can be applied retroactively is its finding that the 2006 coverage formula was too unreliable to continue to be used. But that says nothing about the enforceability of voting changes enacted but not precleared under earlier, constitutional coverage formulas.

Perhaps an even stronger reason to enforce § 5, however, is found by reading *Shelby County* with an eye toward the underlying purpose of the Voting Rights Act.

Preclearance was "a prophylactic measure" intended to halt voting changes in areas with a history of racial discrimination in voting. *City of Rome v. United States*, 446 U.S. 156, 202 (1980). As the Court wrote when it first upheld the Voting Rights Act,

> The record shows that in most of the States covered by the Act, including South Carolina, various tests and devices have been instituted with the purpose of disenfranchising Negroes, have been framed in such a way as to facilitate this aim, and have been administered in a discriminatory fashion for many years. . . . Congress had reason to suppose that these States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself. . . . Under the compulsion of these unique circumstances, Congress responded in a permissibly decisive manner.

*South Carolina v. Katzenbach*, 383 U.S. 301, 333-35 (1966); *see also Beer v. United States,* 425 U.S. 130, 140 (1976) ("Section 5 was a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down.").

Because of this disheartening history, the Supreme Court repeatedly refused to disturb Congress's coverage formula. The Court upheld the 1965 Act, the 1970 reauthorization, the 1975 reauthorization, and the 1982 reauthorization against constitutional challenges, each time "finding that circumstances continued to justify the provisions." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 200 (2009) (collecting cases). And when considering the 1975 reauthorization, which included the period during which § 9-19-17 was enacted, the Supreme Court explained, "Congress' considered determination that at least another 7 years of statutory remedies were necessary to counter the perpetuation of 95 years of pervasive voting discrimination is both unsurprising and unassailable. The extension of the Act, then, was plainly a constitutional method of enforcing the Fifteenth Amendment." *City of Rome*, 446 U.S. at 182.

When circumstances on the ground changed, the coverage formula should have changed too, said *Shelby County*. But the formula was upheld for decades for a reason.

Mississippi was a covered jurisdiction from 1965 to (at a minimum) 2006 because Congress reasonably feared that new voting laws the state enacted would violate the Fifteenth Amendment. Every voting change the Mississippi Legislature enacted in 1980, therefore, was deemed to present too significant a risk of perpetuating racial discrimination.

When *Shelby County* is read against this historical backdrop, it is not clear why Mississippi should be excused from its failure to preclear a 1980 voting change, including and especially § 9-19-17. The statute is a product of a time and era Congress thought unreliable on voting issues. It carries a risk that the persons it excludes from running for office would be excluded for the wrong reasons.

The panel today essentially answers this question: How can a state violate § 5 by seeking to administer a law without preclearance when that state is no longer subject to preclearance? But the state violated § 5 when it failed to seek preclearance for § 9-19-17 in the last 33 years it was a covered jurisdiction.[4] The law was a nullity when enacted and cannot be administered today. So, a more appropriate question may be: How can a state seek to administer a law that is null and void because it was never precleared?

Again, the panel's resolution of the motion is a correct application of the preliminary injunction standard. I certainly agree that under *Shelby County*, states have no obligation to preclear laws enacted by the current generation of voters and legislators. *Shelby County*'s

---

[4] This fact is disheartening in and of itself. As the *Harris* court put it, "we should expect states to comply with federal voting rights law as it stands at the time rather than attempt to predict future legal developments and selectively comply with voting rights law in accordance with their predictions." *Harris*, 993 F. Supp. 2d at 1076.

application to the past, though, is less clear. If skepticism of earlier laws remains justifiable, then this court and others like it have the power to enforce § 5, at least against laws of another era.[5]

---

[5] What remains is the remedy. The remedy for a § 5 violation used to be to require the jurisdiction to seek preclearance. That cannot be ordered because preclearance is gone, but *Shelby County* offers a simpler, easier path forward. The jurisdiction can simply re-enact the voting change. In this case, the plaintiffs' § 5 claim would be rendered moot if the Mississippi Legislature passed (and the Governor signed) § 9-19-17 tomorrow.