IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**RICKEY THOMPSON; RENCIE FELLS**                                             **PLAINTIFFS**

**V.**                                             **CAUSE NO. 3:15-CV-620-JEG-DPJ-CWR-FKB**

**ATTORNEY GENERAL OF THE STATE**                                             **DEFENDANTS**
**OF MISSISSIPPI; LEE COUNTY**
**DEMOCRATIC PARTY EXECUTIVE**
**COMMITTEE; LEE COUNTY**
**ELECTION COMMISSION**

### MEMORANDUM OPINION AND ORDER

Daniel P. Jordan III, Chief District Court Judge:

In *Shelby County v. Holder*,[1] the Supreme Court invalidated the coverage formula that determined which states were required to seek preclearance under Section 5 of the Voting Rights Act of 1965. As such, no state is presently required to obtain preclearance before changing its voting laws. Because Section 5 no longer stands in the way of a state seeking to implement voting changes, we cannot compel a state to obtain preclearance. Accordingly, we hold that Mississippi may now disqualify judicial candidates based on voting laws that were enacted prior to *Shelby County* but never precleared.

For that reason, we grant the Mississippi Attorney General's Motion for Summary Judgment [58] and deny Plaintiffs Rencie Fells and Rickey Thompson's Motion for Summary Judgment [54]. We further find that Defendant Lee County Election Commission's Motion for Summary Judgment [42] and Plaintiffs' Motion to Join Marcus Crump as a Party [56] are moot.[2]

---

[1] 570 U.S. 529 (2013).

[2] After the Election Commission moved for summary judgment, Plaintiffs filed a Notice of Voluntary Dismissal [51]. But because the Election Commission had already answered, Plaintiffs

**I.     Background**

In January 2004, Rickey Thompson became the first elected African-American Justice Court Judge in Lee County, Mississippi. Am. Compl. [10] at 2; *Thompson v. Att'y Gen. of Miss.*, 129 F. Supp. 3d 430, 432 (S.D. Miss. 2015). His tenure was rocky, and on May 21, 2015, the Mississippi Supreme Court determined that Thompson had repeatedly engaged in misconduct and ordered him removed from office. *Miss. Comm'n on Jud. Performance v. Thompson*, 169 So. 3d 857, 874 (Miss. 2015). Under Mississippi law, the removal made Thompson permanently ineligible for judicial office in the state. Miss. Code. Ann. § 9-19-17.[3]

Nine days before the Mississippi Supreme Court's mandate, Thompson won the Democratic primary for the same position. That victory presented a dilemma for the Lee County Democratic Party and the Lee County Election Commission: If the Mississippi Supreme Court's decision had in fact rendered Thompson ineligible to again serve as a judge, then the Democratic Party could not certify Thompson as its nominee as a matter of law, and the Election Commission could not place his name on the ballot. The Lee County Democratic Party therefore sought advice from the Mississippi Attorney General, who recommended that the Party follow section 9-19-17 and select a different candidate to stand for the general election. *See Thompson*, 129 F. Supp. 3d at 432.

---

could not unilaterally dismiss that defendant without a court order. *See* Fed. R. Civ. P. 41(a). Regardless, the ruling in this opinion moots the Election Commission's motion, and, alternatively, Plaintiffs have abandoned their claims against the Election Commission. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) ("[Plaintiff's] failure to pursue this claim beyond [the] complaint constituted abandonment.").

[3] "A justice or judge removed by the supreme court or the seven-member tribunal is ineligible for judicial office, and pending further order of the court, may be suspended from practicing law in this state." Miss. Code Ann. § 9-19-17.

On August 21, 2015, Thompson and Fells, a voter in Thompson's district, sued the Mississippi Attorney General, the Lee County Democratic Party Executive Committee, and the Lee County Election Commission (collectively "the State"). *Id.* They challenged section 9-19-17, arguing that the statute violates the Voting Rights Act of 1965, the Fourteenth Amendment of the U.S. Constitution, and section 171 of the Mississippi Constitution. *Id*.

Soon after, we rejected Plaintiffs' motion for a temporary restraining order, denied their request for a preliminary injunction as to their claims under Sections 2 and 5 of the Voting Rights Act, and dismissed their state-law claim. *See id.* at 436; *Thompson v. Att'y Gen. of Miss.*, No. 3:15-CV-620, 2015 WL 12916336, at *3 (S.D. Miss. Sept. 9, 2015).

In May 2016, Plaintiffs purported to voluntarily dismiss all claims except for their Section 5 claim. Notice of Voluntary Dismissal [51]; *see supra* note 2. Then, in June 2016, Plaintiffs moved for summary judgment, requesting (1) a declaratory judgment that section 9-19-17 is void and unenforceable because it violates Section 5, and (2) an injunction directing the State to conduct a special election wherein Thompson is the Democratic nominee. Mot. [54]; Mem. [55]. The State filed a cross-motion for summary judgment. Mot. [58].

We then stayed the case in January 2017, pending the Mississippi Supreme Court's decision in a related case construing section 177A of the Mississippi Constitution.[4] Order [64].

---

[4] Section 177A states, in relevant part:

> On recommendation of the commission on judicial performance, the Supreme Court may remove from office, suspend, fine or publicly censure or reprimand any justice or judge of this state for: (a) actual conviction of a felony in a court other than a court of the State of Mississippi; (b) willful misconduct in office; (c) willful and persistent failure to perform his duties; (d) habitual intemperance in the use of alcohol or other drugs; or (e) conduct prejudicial to the administration of justice which brings the judicial office into disrepute; and may retire involuntarily any justice or judge for physical or mental disability seriously

3

In May 2017, the Mississippi Supreme Court held "that the phrase 'remove from office' found in [s]ection 177A of the Mississippi Constitution necessarily means a permanent separation from office, such that an individual judge removed from office remains ineligible to return to it." *Thompson v. Att'y Gen.*, 227 So. 3d 1037, 1044 (Miss. 2017). The parties subsequently submitted supplemental briefing in this case to address section 177A. Mem. [65]; Resp. [66]; Resp. [69]; Reply [71].[5]

The final wrinkle occurred in 2019, when Thompson was elected to the Mississippi House of Representatives; he began serving in early 2020. Considering that development, we ordered additional briefing on whether this case is moot and allowed the parties to supplement their original briefs with any new authority. Order [75]. The parties submitted that briefing, *see* Mem. [78]; Mem. [81]; Rebuttal [82], and we now address the mootness issue and the merits of the Section 5 claim.

**II.     Mootness**

Mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (citation omitted). "Generally, any set of circumstances that eliminates actual controversy after the

---

       interfering with the performance of his duties, which disability is or is likely to become of a permanent character.

[5] Plaintiffs never amended the Complaint to include a Section 5 claim addressing section 177A. But the State never objected and substantively addressed Plaintiffs' arguments. *See* Mem. [66] at 3, 8–10.  Section 177A is therefore properly before the Court on the parties' implied consent. *See* Fed. R. Civ. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.").

commencement of a lawsuit renders that action moot," but there are exceptions to the mootness doctrine. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006).

One such exception is the class of controversies "capable of repetition, yet evading review." *Id.* (quoting *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 774 (1978)). To invoke this exception, a plaintiff must show that "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). The parties have concluded that this exception applies; we agree.

Plaintiffs satisfy the first prong. "Controversy surrounding election laws . . . is one of the paradigmatic circumstances in which the Supreme Court has found that full litigation can never be completed before the precise controversy (a particular election) has run its course." *Ctr. for Individual Freedom*, 449 F.3d at 661. Thus, "suits challenging the validity of state election laws are classic examples of cases in which the issues are 'capable of repetition, yet evading review.'" *Id.* (quoting *Morial v. Judiciary Comm'n*, 565 F.2d 295, 297 n.3 (5th Cir. 1977)). Thompson was removed from office on August 13, 2015, and sought inclusion on the ballot for the November general election. The few-month period between his removal and the election was "too short" for the case to be fully litigated. *Fed. Election Comm'n*, 551 U.S. at 462.

Plaintiffs also meet the second prong. The Fifth Circuit has applied the mootness exception in election cases where any candidate would likely face the challenged restrictions in the future. For instance, in *Moore v. Hosemann*, Brian Moore sued the Mississippi Secretary of State after being left off the state's 2008 presidential ballot for failing to submit his qualifying papers by the statutory deadline. 591 F.3d 741, 742–43 (5th Cir. 2009). The court concluded that

the case was not moot, even though Moore failed to aver that he would again run for President. *Id.* at 744. In reaching that conclusion, the Fifth Circuit noted that courts have applied the second prong "somewhat loosely" in election cases. *Id.* It then held: "As long as the complained-of deadline is in place, future candidates in Mississippi will be subject to it and will need to conform to its demands. Thus, the effects of the deadline will persist." *Id.* at 745 (holding that Moore satisfied "both prongs of the mootness exception"); *accord Kucinich v. Tex. Democratic Party*, 563 F.3d 161, 163–64 (5th Cir. 2009).

Though Thompson has not explicitly stated whether he intends to run for his prior judicial office in the future, neither he nor a similarly situated candidate could do so under section 177A and section 9-19-17. Thus, the laws preventing Thompson from running again for his prior judicial office are "in place," and the State will not (and cannot) permit candidates like Thompson to appear on the ballot. *Moore*, 592 F.3d at 745. We conclude that Plaintiffs satisfy the "capable of repetition, yet evading review" exception to the mootness doctrine. *First Nat'l Bank*, 435 U.S. at 744.

### III. Section 5 of the Voting Rights Act

#### A. Summary Judgment Standard

A court shall grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is material if it "might affect the outcome of the suit under the governing law." *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In evaluating a motion for summary judgment, a court must "construe 'all facts and inferences in the light most favorable to the nonmoving party.'" *Romero v. City of*

*Grapevine*, 888 F.3d 170, 175 (5th Cir. 2018) (quoting *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)).

**B.     Legal Analysis**

In 1965, Congress passed the Voting Rights Act to "rid the country of racial discrimination in voting." *Hathorn v. Lovorn*, 457 U.S. 255, 268 (1982) (citation omitted). The Act was "a response to the unremitting and ingenious defiance of the command of the Fifteenth Amendment for nearly a century by State officials in certain parts of the Nation." *McCain v. Lybrand*, 465 U.S. 236, 243 (1984) (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966) (internal quotation marks omitted)).

Certain sections of the Act "target[ ] only some parts of the country." *Shelby County*, 570 U.S. at 537. Significant here, Section 4(b) provides a formula to identify "any State or . . . political subdivision" that must comply with additional restrictions. 52 U.S.C. § 10303(b). Those additional restrictions—found in Section 5—prohibit a jurisdiction covered by Section 4 from administering new voting laws until it obtains either judicial preclearance from the U.S. District Court for the District of Columbia or administrative preclearance from the U.S. Attorney General. *Id.* § 10304(a).

"Sections 4 and 5 were intended to be temporary; they were set to expire after five years." *Shelby County*, 570 U.S. at 538. But over time, Congress saw a continuing need to protect voting rights and reauthorized the Act in 1970, 1975, 1982, and 2006. *Id.* at 538–39. Notably, the Supreme Court upheld the first three reauthorizations against constitutional attacks. *See id.* at 539 (citing *Georgia v. United States*, 411 U.S. 526 (1973); *City of Rome v. United States*, 446 U.S. 156 (1980); *Lopez v. Monterey County*, 525 U.S. 266 (1999)). But in 2013, the *Shelby County* Court found the 2006 reauthorization unconstitutional. *See id.* at 557.

In simple terms, the Court faulted Congress for failing to update Section 4's coverage formula and treating some states differently than the rest "based on decades-old data and eradicated practices." *Id.* at 551. Thus, the Court held that "[t]he formula in [Section 4] can no longer be used as a basis for subjecting jurisdictions to preclearance." *Id.* at 557.

Though *Shelby County* struck Section 4, it did not invalidate Sections 2 or 5 of the Voting Rights Act. *Id.* at 557. But without a coverage formula in place, previously covered jurisdictions were no longer required to obtain preclearance under Section 5. *Id.* at 557. Indeed, formerly covered states and counties enacted (and enforced) voting laws, practices, and procedures—without preclearance—immediately after the Court's ruling. *See Thompson*, 129 F. Supp. 3d at 435.

The present dispute questions the scope of *Shelby County*. It is an unusual and hopefully rare case because it relates to state voting laws that apparently slipped through the preclearance cracks before 2013. Specifically, we contemplate section 177A of the Mississippi Constitution and Mississippi Code section 9-19-17, both of which were enacted when Mississippi was a covered jurisdiction under Section 4. And because they were enacted in 1979 and 1980, the controlling coverage formulas were valid. *See City of Rome*, 446 U.S. at 182.[6]

1. **Until *Shelby County*, the Disputed Provisions Required Preclearance.**

Before 2013, section 177A and section 9-19-17 required preclearance under Section 5 for two reasons. First, while it was enforceable, Section 5 covered judicial elections. *See Clark v. Roemer*, 500 U.S. 646, 650 (1991) (requiring preclearance for judicial elections); *Haith v.*

---

[6] Since *Shelby County*, there has been only one other case that has addressed this precise issue, and in that case, the district court similarly dismissed Section 5 claims based upon un-precleared voting laws that were enacted while Section 4 was still valid. *See Hall v. Louisiana*, 973 F. Supp. 2d 675, 683-84 (M.D. La. 2013).

*Martin*, 618 F. Supp. 410, 413 (E.D.N.C. 1985), *aff'd*, 477 U.S. 901 (1986) (issuing summary affirmance of decision holding that Section 5 applied to judges).[7]

Second, both section 177A and section 9-19-17 are candidacy requirements to which Section 5 applies. *See Presley v. Etowah Cnty. Comm'n*, 502 U.S. 491, 502 (1992) ("[Section] 5 applies to . . . candidacy requirements and qualifications."); *Allen v. State Bd. of Elections*, 393 U.S. 544, 551 (1969) (holding that changes in candidacy requirements require preclearance).

The State disputes this second point based on *Russell v. Brantley*, an unpublished opinion from a three-judge panel holding that section 177A is not covered under Section 5 because it "does not directly affect voting and the power of Mississippi citizens to elect their judges." No. 3:96-CV-275, Mem. Op. & Order [19], at 11 (S.D. Miss. Mar. 24, 1997); *see also Miss. Comm'n on Jud. Performance v. Dodds*, 680 So. 2d 180, 206 (Miss. 1996) (concluding that because "[section] 177A is not concerned with how one gains office it should not be subject to the preclearance requirements of [S]ection 5") (internal quotation marks omitted).

But the *Russell* panel never considered the issue before this Court. There, the panel examined whether the state could "sanction *and possibly remove* from office an elected judge" without preclearing section 177A. *Russell*, No. 3:96-CV-275, Mem. Op. & Order [19] at 7 (emphasis added). Though the panel found that it could, the panel was not asked to decide whether section 177A would require preclearance if used to disqualify a removed judge from

---

[7] Whether Section 5 covered judicial elections was not, however, firmly decided when the State enacted these laws in 1979 and 1980. A three-judge panel from this district held in 1986 that Section 5 applies to judicial elections. *See Kirksey v. Allain*, 635 F. Supp. 347, 350 (S.D. Miss. 1986). And the United States Supreme Court first spoke to the issue in a summary affirmance later that year. *See Haith*, 618 F. Supp. at 413 (applying Section 5 to judicial elections), *aff'd*, 477 U.S. 901 (1986). Regardless, Mississippi was on notice of the preclearance requirement before the Court decided *Shelby County*.

9

again running for judicial office. Indeed, the panel reviewed section 177A before the Mississippi Supreme Court construed the provision as disqualifying previously removed judicial candidates. *See Thompson*, 227 So. 3d at 1044. And because the panel focused on the power to sanction a judge and not the authority to disqualify one from seeking office, it had no need to address whether section 9-19-17 required preclearance before it could be enforced to block a judicial candidate. Here, Plaintiffs seek an injunction that would allow removed judges to again run for a judicial position—a candidacy requirement. That's a different question.

In sum, section 177A and section 9-19-17 fall under Section 5's preclearance requirements, so at some point preclearance was required. It was never obtained.

### 2. After *Shelby County*, the Disputed Provisions Require no Preclearance.

The ultimate issue is whether post-*Shelby County*, the State may administer or enforce laws it was required to preclear but never did. At the preliminary-injunction stage, we held:

> [B]ecause [Section] 5 cannot be enforced after *Shelby County*, and this Court cannot enjoin the state authorities from seeking to administer the provisions set forth in [section] 9-19-17, the plaintiffs have not persuaded us that they have a substantial likelihood of success on the merits of this claim.

*Thompson*, 129 F. Supp. 3d at 436.

The dissenting opinion faults the State for failing to seek preclearance in the years following our unanimous holding. But the State has had no reason to seek preclearance because nothing has changed since then. Congress has not fixed Section 4, and, if anything, our holding has gained support. Most notably, in *Voketz v. City of Decatur*, the Eleventh Circuit faced a similar issue and found our analysis persuasive: "*Thompson*'s reasoning and holding that § 5 no longer prohibits changes to voting procedures—even for laws passed while § 5 was still applicable—agrees with our analysis and conclusion here." 904 F.3d 902, 909 (11th Cir. 2018).

That said, we now consider the case under the Rule 56 standards. At this stage, Plaintiffs' best argument is their simplest—*Shelby County* invalidated the 2006 reauthorization, whereas Mississippi's un-precleared voting changes were enacted under earlier formulas that survived constitutional challenges. *See Shelby County*, 570 U.S. at 538–39 (stating that 1970, 1975, and 1982 amendments extending or reauthorizing Section 4's coverage formula were upheld as constitutional). They reason that the disputed provisions are void *ab initio* and still require preclearance under Section 5 before they may be administered.

But Section 5 never prevented a covered jurisdiction from "enact[ing] or *seek*[ing] to administer" a new voting law before preclearance. 52 U.S.C. § 10304(a) (emphasis added). To the contrary, it expressly allowed states to do so; preclearance was triggered *after* enactment or when a covered state sought to administer a change. In relevant part, Section 5 states:

> **Whenever a [covered] State** . . . **shall enact or seek to administer** any . . . standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, . . . such State or subdivision **may institute an action** in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, **and unless and until the court enters such judgment** no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, That such qualification, prerequisite, standard, practice, or procedure **may be enforced** without such proceeding if the qualification, prerequisite, standard, practice, or procedure [is precleared through the Attorney General].

*Id.* (bold emphasis added).

The Supreme Court construed this language to mean that enacted but un-precleared state laws were "not . . . effective as la[w] until and unless cleared." *Clark*, 500 U.S. at 652 (quoting *Connor v. Waller*, 421 U.S. 656, 656 (1975)); *see also Shelby County*, 570 U.S. at 544 (noting that covered states were required to obtain preclearance for "validly enacted law[s]"); *Thompson*,

11

129 F. Supp. 3d at 434 (observing that new laws are "simply 'not effective' until . . . 'cleared pursuant to § 5'" (quoting *McCain*, 465 U.S. at 245)). And when a state attempted to administer an un-precleared voting change, plaintiffs were "entitled to an injunction prohibiting the State from implementing" those changes. *Clark*, 500 U.S. at 652–53 (citing *Allen*, 393 U.S. at 572).

Thus, un-precleared voting changes were never void—as Plaintiffs have argued—they were simply "unenforceable" until precleared under Section 5. *Clark*, 500 U.S. at 652 (quoting *Hathorn*, 457 U.S. at 269). That changed when *Shelby County* held: "The formula in [Section 4] can no longer be used as a basis for subjecting jurisdictions to preclearance." 570 U.S. at 557. So, because the State is no longer covered by Section 4, Section 5 is "functionally unenforceable" and preclearance is no longer mandated. *Voketz*, 904 F.3d at 906; *see also King v. Lumpkin*, 545 F. App'x 799, 803 n.2 (11th Cir. 2013) (observing that based on *Shelby County*, "the preclearance requirements of Section 5 of the [Voting Rights Act] cannot be enforced until Congress amends the coverage formula in Section 4"). We therefore reject the argument that Section 5 continues to render the disputed provisions unenforceable.[8]

We recognize that the *Shelby County* majority "issue[d] no holding on § 5 itself, only on the coverage formula." 570 U.S. at 557. That statement must, however, be viewed in context. In the lower courts, *Shelby County* challenged the constitutionality of both Section 4 and Section 5. *Id.* at 540. But the Court generally exercises judicial review on the narrowest available grounds.

---

[8] The dissenting opinion states that we have "avoided the full text of § 5" and relied instead on merely persuasive authority. Respectfully, that conclusion misconstrues our core analysis. We acknowledge what Section 5 required while states were subject to it. But we depart from the dissenting opinion because Section 4's formula "can no longer be used as a basis for subjecting jurisdictions to preclearance." *Shelby County*, 570 U.S. at 557. Our conclusion that previously unenforceable laws no longer require preclearance tracks *Shelby County*, Section 5's full text, and nearly 50 years of Supreme Court precedents explaining the impact of failing to obtain preclearance. *See Clark*, 500 U.S. at 652.

*See id.* at 540. And without Section 4, Shelby County could not be forced to comply with Section 5, leaving no reason for the Court to conduct further review. As Justice Ginsburg aptly described, "The Court purports to declare unconstitutional only the coverage formula set out in § 4(b). . . . But without that formula, § 5 is immobilized." *Id.* at 559 n.1 (Ginsburg, J., dissenting); *see also id.* ("The Court stops *any* application of § 5 by holding that § 4(b)'s coverage formula is unconstitutional.") (Ginsburg, J., dissenting) (emphasis added). Though the majority meticulously addressed the dissent's arguments, it took no issue with Justice Ginsburg's conclusion regarding the holding's impact on Section 5.

And Justice Ginsburg's conclusion comports with what happened next. After the Court decided *Shelby County*, the D.C. Circuit remanded the case to the district court with instructions to enter declaratory judgment in Shelby County's favor on the Section 4(b) claim and "dismiss[] Shelby County's constitutional challenge to Section 5 as moot." *Shelby County v. Holder*, 541 F. App'x 1, 2 (D.C. Cir. 2013). The Supreme Court likewise summarily dismissed two preclearance appeals—though the appeals did not involve laws passed before 2006 as in this case. *See Texas v. Holder*, 570 U.S. 28 (2013) (vacating denied preclearance for Texas's voter-ID law); *Texas v. United States*, 570 U.S. 98 (2013) (vacating denied preclearance for Texas's redistricting plan).

Applied here, section 177A and section 9-19-17 were validly enacted, but Section 5 initially prohibited the State from administering or enforcing them. *Shelby County* removed that impediment in 2013 when it struck down Section 4, because "[t]he provisions of § 5 apply only to those jurisdictions singled out by § 4." *Shelby County*, 570 U.S. at 550. And because Mississippi is not subject to preclearance, there is no present prohibition against administering its validly enacted laws that preclude Thompson from seeking judicial office. *Id.* at 557. We therefore grant summary judgment for the State.

**IV.     Conclusion**

For the foregoing reasons, we **GRANT** Defendants' Cross-Motion for Summary Judgment [58] and **DENY** Plaintiffs' Motion for Summary Judgment [54]. The remaining motions [42 and 56] are moot. Final judgment will be entered separately.

James E. Graves, Jr., Circuit Judge, joins this opinion; Carlton W. Reeves, District Court Judge, dissents in part:

We agree. This case is not moot. We also agree that the provisions at issue are a candidacy requirement. Notwithstanding my great admiration for my brethren in the majority, we part ways on how to resolve the § 5 claim.[9]

There are two principal points of disagreement.

## I. The Majority Disregards the Text of the Voting Rights Act

The Supreme Court "has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1749 (2020). We cannot ignore "Congress's key drafting choices" or dismiss a statutory provision that Congress intentionally added. *Id.* at 1753; *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012).

The text of the Voting Rights Act controls this case. Section 5 of the Act places four requirements upon covered states. Specifically, whenever (1) a state (2) "shall enact or seek to administer any voting qualification" (3) while the coverage formula is "in effect," it (4) must

---

[9] Readers new to the case may benefit from reading the prior opinions. *See Thompson v. Att'y Gen. of Miss.*, 129 F. Supp. 3d 430 (S.D. Miss. 2015).

preclear the change through the U.S. Department of Justice or "the United States District Court for the District of Columbia." 52 U.S.C. § 10304(a). That is what the statute commands.

Here, elements one through three are easily satisfied: Mississippi enacted a new voting qualification while the coverage formula was in effect. That triggered the fourth and final element—the state was required to preclear the voting qualification through DOJ or the D.C. District Court.

Mississippi did not.[10] Its failure renders the voting qualification unenforceable. Even the majority admits that "enacted but un-precleared state laws were 'not effective as law until and unless cleared.'" Majority Op. at 11 (quoting *Clark v. Roemer*, 500 U.S. 646, 652 (1991)). "[T]hat should be the end of the analysis." *Bostock*, 140 S. Ct. at 1743 (quotation marks and citation omitted).

The majority nevertheless argues that Mississippi is not violating § 5 because it *seeks to administer* a voting change now, while Mississippi is not bound by the coverage formula. *See* Majority Op. at 13. It is as if the majority reads the statute to say, ". . . shall enact *then* seek to administer any voting qualification." Respectfully, however, the majority has overlooked the word "or" in the statute.

The Voting Rights Act says a state triggers preclearance if it seeks to administer *or* enacts a voting qualification while a covered jurisdiction. 52 U.S.C. § 10304(a). So it does not matter that the State is seeking to administer a voting qualification today: Mississippi enacted one while

---

[10] Mississippi also failed to seek preclearance in the D.C. District Court during the six years this case has been pending. *See Thompson*, 129 F. Supp. 3d at 437 (Graves, J., concurring) ("*Shelby County* did not strip the United States District Court for the District of Columbia of jurisdiction to hear an action seeking a declaratory judgment that § 9-19-17 complies with the Voting Rights Act. Mississippi could file such an action and an affirmative decision would dissolve any injunction.").

15

a covered jurisdiction. *Shelby County* did not change that fact, and the majority does not contest that fact. Preclearance is required.

For this reason alone, an injunction should issue.

## II.  The Majority Incorrectly Expands Shelby County

I am also concerned with the majority's interpretation of *Shelby County v. Holder*, 570 U.S. 529 (2013). My colleagues believe that *Shelby County* gives Mississippi a pass for failing to follow the Voting Rights Act's explicit command. They write, "because the State is no longer covered by Section 4, Section 5 is 'functionally unenforceable' and preclearance is no longer mandated." Majority Op. at 12 (citation omitted). But that is an incomplete statement of law.

At the outset, my colleagues' interpretation is at odds with the text of *Shelby County*. The Court's opinion took pains to discourage any interpretation that would nullify § 5. It explicitly stated, "[w]e issue no holding on § 5 itself, only on the coverage formula." 570 U.S. at 557. We should do the same.

More unfortunately, the majority's interpretation constitutes a significant expansion of *Shelby County*. The majority would strike down § 4 for all time. That's not right.

*Shelby County* simply holds that the 2006 reauthorization of § 4 was unconstitutional. *See id.* at 550-51. It follows that from 2006 onward, voting changes are not subject to preclearance. Today, for example, a formerly-covered jurisdiction may enact and "freely implement its desired changes." *Voketz v. Decatur, Ala.*, 904 F.3d 902, 909 (11th Cir. 2018).

***Previous*** voting changes, however, remain subject to preclearance, because a lawful coverage formula was in effect from 1965 to 2006. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 200 (2009) ("Congress reauthorized the Act in 1970 (for 5 years), 1975 (for 7 years), and 1982 (for 25 years). . . . We upheld each of these reauthorizations against

constitutional challenges, finding that circumstances continued to justify the provisions."). The Voting Rights Act's past versions, and all of the injunctions that issued pursuant to those versions, remain in place.

Section 5's preclearance requirement is a vital part of the Act's extraordinary mission: "to realize the purpose and promise of the Fifteenth Amendment." *Shelby County*, 570 U.S. at 593 (Ginsburg, J., dissenting). To this end, Mississippi earned its place among the covered jurisdictions for four decades because Congress reasonably feared that the State would continue to engage in "substantial voting discrimination." *South Carolina v. Katzenbach*, 383 U.S. 301, 329 (1966). "When *Shelby County* is read against this historical backdrop, it is not clear why Mississippi should be excused from its failure to preclear a 1980 voting change." *Thompson*, 129 F. Supp. 3d at 440 (Reeves, J., concurring in the judgment).

We do not know whether there are more laws like this out there—voting changes from the 1970s and 1980s that were never submitted for preclearance. But the majority and I would treat those laws very differently. In essence, the majority holds that the judiciary is powerless to enjoin such laws; § 5 is forever unenforceable. That cannot be the case. The better interpretation of *Shelby County*—and the way to honor § 5, which remains on the books—is that voting changes enacted while a lawful coverage formula was in effect remain subject to preclearance.

### III. Conclusion

The majority opinion takes an interesting approach. It avoids the full text of § 5, despite the Supreme Court's recent admonition that "Judges are not free to overlook plain statutory commands." *Bostock*, 140 S. Ct. at 1754. It relies upon Justice Ginsburg's dissent to explain the majority holding of *Shelby County*. Majority Op. at 13. It then draws sustenance from Eleventh

Circuit and Supreme Court cases about post-2006 voting changes, despite the question today having to do with pre-2006 voting changes. *Id.* at 12-13.

      For the reasons stated above, I am not persuaded that we should abandon the text of the Voting Rights Act or broaden *Shelby County* far beyond its narrow holding. I respectfully dissent.